UNITED STATES COURT OF APPEALS FOR THE SECOND CIRCUIT
Thurgood Marshall U.S. Courthouse    40 Foley Square, New York, NY 10007 Telephone: 212-857-8500

MOTION INFORMATION STATEMENT

Docket Number(s): 16-2592 CV

Caption [use short title]

Motion for: motion to request the filing of an Amended Amicus Brief
in compliance with FRAP 29(a)(4)(F)(5) Length

Set forth below precise, complete statement of relief sought:

Order allowing filing of an Amended Amicus Brief in compliance

with FRAP 29(a)(4)(F)(5) with a total word count of 6, 481 words

BETHPAGE WATER DISTRICT,

                Plaintiff-Appellant,

v.

NORTHROP GRUMMAN CORPORATION,
NORTHROP GRUMMAN SYSTEMS
CORPORATION,

                Defendants-Appellees

MOVING PARTY: Amicus Curiae

OPPOSING PARTY: _____

[ ] Plaintiff                [ ] Defendant
[ ] Appellant/Petitioner     [ ] Appellee/Respondent

MOVING ATTORNEY: Michael F. Ingham

OPPOSING ATTORNEY: _____

[name of attorney, with firm, address, phone number and e-mail]

Carman, Callahan & Ingham, LLP

266 Main Street

Farmingdale New York 11735

Court-Judge/Agency appealed from: Judge Feuerstein

Please check appropriate boxes:

Has movant notified opposing counsel (required by Local Rule 27.1):
[ ] Yes [✓] No (explain): _____

Opposing counsel's position on motion:
[ ] Unopposed [ ] Opposed [✓] Don't Know
Does opposing counsel intend to file a response:
[ ] Yes [ ] No [✓] Don't Know

FOR EMERGENCY MOTIONS, MOTIONS FOR STAYS AND
INJUNCTIONS PENDING APPEAL:
Has request for relief been made below?                    [ ] Yes [ ] No
Has this relief been previously sought in this Court?      [ ] Yes [ ] No
Requested return date and explanation of emergency: _____

Is oral argument on motion requested?    [ ] Yes [✓] No  (requests for oral argument will not necessarily be granted)

Has argument date of appeal been set?    [✓] Yes [ ] No  If yes, enter date: September 29, 2017

Signature of Moving Attorney:
_____  Date: 9/12/17    Service by: [✓] CM/ECF    [ ] Other [Attach proof of service]

Form T-1080 (rev. 12-13)

No. 16-2592

---

IN THE
UNITED STATES COURT OF APPEALS
FOR THE SECOND CIRCUIT

---

BETHPAGE WATER DISTRICT,

              Plaintiff-Appellant,

v.

NORTHROP GRUMMAN
CORPORATION,
NORTHROP GRUMMAN
SYSTEMS
CORPORATION,

              Defendants-Appellees.

On Appeal from the United States District
Court for the Eastern District of New York

No. 2:13-CV-06362

The Honorable Sandra J. Feuerstein,
    United States District Judge

**DECLARATION OF MICHAEL F. INGHAM IN SUPPORT OF
THE MOTION BY AMICUS LONG ISLAND WATER CONFERENCE, NASSAU
SUFFOLK WATER COMMISSIONERS ASSOCIATION AND THE NASSAU COUNTY
VILLAGE OFFICIALS ASSOCIATION TO FILE AN AMENDED BRIEF IN
COMPLAINCE WITH FRAP 29(a)(4)(F)(5)**

STATE OF NEW YORK )

                   ss.:

COUNTY OF NASSAU )

I, Michael F. Ingham, declares as follows:

1.       I am the Senior Partner in Carman, Callahan & Ingham, LLP.

2.       I have been retained by the Long Island Water Conference, Nassau Suffolk Water Commissioners Association and the Nassau County Village Officials Association to prepare and file an Amicus Brief in support of Plaintiff-Appellants in this matter.

3.       On August 25, 2017, this Court granted the Amicus' motion to file said brief.

4.       After hours on September 1, 2017, the Defendant-Appellees Northrop Grumman ("NG") filed a motion to vacate this Court's order (annexed hereto as Exhibit A).

5.       Pursuant to the direction of this Court's calendar clerk, on September 12, 2017, the Amicus filed their opposition to said motion to vacate. Ingham September 12, 2017 Declaration annexed hereto as Exhibit B. Memorandum of Law responding to NG's motion to vacate annexed hereto as Exhibit C.

6.     The original Amicus Brief accepted by the Court in its Order was 7,474 words.  The Amicus inadvertently enlarged the Brief under the mistaken belief that the word count was 7,500 words.

7.     NG has demanded strict compliance with FRAP 29(a)(4)(F)(5) Length.

8.     Accordingly, we respectfully request that this Honorable Court grant this motion to submit an amended Amicus Brief with a total word count of 6,481 words. (Annexed hereto as Exhibit D).

I declare under penalty of perjury under the laws of the United States of American that the foregoing is true and correct.

Dated:  Farmingdale, New York
        September 12, 2017

_____
        MICHAEL F. INGHAM

**EXHIBIT A**

# UNITED STATES COURT OF APPEALS
## FOR THE
## SECOND CIRCUIT

_____

     At a Stated Term of the United States Court of Appeals for the Second Circuit, held at the Thurgood Marshall United States Courthouse, 40 Foley Square, in the City of New York, on the 1st day of September, two thousand and seventeen,

_____

Bethpage Water District,

          Plaintiff - Appellant,

v.

Northrop Grumman Corporation, Northrop Grumman
Systems Corporation,

          Defendants - Appellees.

_____

**ORDER**
Docket No. 16-2592

    IT IS HEREBY ORDERED that the motion by Movant Long Island Water Conference, et al to file an Amicus Curiae brief is GRANTED.

               For The Court:

               Catherine O'Hagan Wolfe,
               Clerk of Court

**EXHIBIT B**

No. 16-2592

IN THE
UNITED STATES COURT OF APPEALS
FOR THE SECOND CIRCUIT

BETHPAGE WATER DISTRICT,

          Plaintiff-Appellant,

v.

NORTHROP GRUMMAN
CORPORATION,
NORTHROP GRUMMAN
SYSTEMS
CORPORATION,

          Defendants-Appellees.

On Appeal from the United States District
Court for the Eastern District of New York

No. 2:13-CV-06362

The Honorable Sandra J. Feuerstein,
   United States District Judge

**DECLARATION OF MICHAEL F. INGHAM IN REPLY TO
DEFENDANTS-APPELLEES' MOTION TO VACATE THE AMICUS BRIEF FILED
ON BEHALF OF LONG ISLAND WATER CONFERENCE, NASSAU SUFFOLK
WATER COMMISSIONERS ASSOCIATION AND THE NASSAU COUNTY VILLAGE
OFFICIALS ASSOCIATION IN SUPPORT OF PLAINTIFF-APPELLANT**

STATE OF NEW YORK )

                                ss.:

COUNTY OF NASSAU )

I, Michael F. Ingham, declares as follows:

1.       I am the Senior Partner in Carman, Callahan & Ingham, LLP.

2.       This firm's association with the Long Island water industry commenced in 1946 when its founder, the Honorable Willis B. Carman, Sr., became general counsel to the South Farmingdale Water District ("SFWD"). This District is directly downgradient of the approaching of OU2 and OU3 Grumman/Navy toxic plumes.

3.       Beyond continued representation of the SFWD, I have also represented the Jericho Water District ("JWD") as general counsel since 1986.

4.       In addition to the SFWD and JWD, I am currently general counsel to the following Commissioner Elected Improvement Districts on Long Island:

           a)       Massapequa Water District

           b)       Great Neck Water Pollution Control District;

           c)       Bethpage Water District;

           d)       Port Washington Water Pollution Control District;

           e)       Plainview Water District.

5.      In the past, I have served as special counsel to the Town of Hempstead Water Department, the Suffolk County Water Authority and the Locust Valley Water District.  I am currently special counsel to the municipal Westchester Joint Water Works headquartered in Eastchester.

6.      For the last thirty years, I have actively represented, as attorney of record, all of these Districts in a myriad of assorted litigations both large and small. (See, Exhibit A, Municipal Litigation Schedule).

7.      By virtue of my career with the Water Districts, I was selected as the first general counsel to the Long Island Water Conference ("LIWC")[1] by its Executive Board in 2010.

8.      By virtue of my position as general counsel, I was selected by the Executive Committee of the LIWC as counsel to represent the multiple interests of their many members in the filing of an Amicus Brief on their behalf.

9.      The Chairman of the Executive Committee of the Nassau Suffolk Water Commissioners Association ("NSWCA") invited me to speak before the entire

---

[1]   As set forth in the Rule 26 Disclosure Statement, I was selected to represent all three Amicus by a vote of their respective Executive Committees. Contrary to the assertion by Northrop Grumman ("NG")at page 2 of its Memorandum, Mr. Boufis had no direct vote on this issue as he was no longer on the Executive Committee of the LIWC. The Chairman of the Executive Committee of the LIWC at the time of my retention as counsel to the Amicus was Stan Carey.  Mr. Carey is Superintendent of the Massapequa Water District which, like its sister water district to the east South Farmingdale Water District, is directly downgradient of both the OU2 and OU3 toxic plumes.

association regarding the Amicus Brief I was preparing for the LIWC.[2]  Shortly after this presentation, I was retained as counsel to the NSWCA to prepare a joint Amicus Brief.

10.    The LIWC and the NSWCA funded the Amicus Brief with a total contribution of $20,000.[3] No other individual or entity, specifically counsel of record for Plaintiff-Appellant Weitz & Luxenberg, P.C. ("W & L"), contributed any funding to the preparation of this Amicus Brief. Indeed, there was zero communication between myself and any member of W & L regarding any aspect of the Amicus Brief.

11.    While it have no direct relationship with the Nassau County Village Officials Association ("NCVOA"), I have known the Mayor of Farmingdale, Ralph Ekstrand, for over thirty years.  Farmingdale is one of the dozen Villages in Nassau Count that operates their own water distribution systems.  Over the years I have discussed numerous water related issues with the Mayor and was directly involved in the Intermunicipal Agreement where Bethpage Water District provides emergency service to the Village.

---

[2]   The Chairman of the Executive Committee, Mr. Andrew Bader, is a Commissioner at the Plainview Water District.

[3]   The Advisory Committee Notes on this issue indicate that this contribution will assist this Court in determining "whether the Amicus itself considers the issue important enough to sustain the cost and effort of filing an Amicus Brief".

12.    I informed the Mayor of the impact of Judge Feuerstein's decision on all water providers who have undertaken preliminary engineering in preparation of an advancing toxic plume.  In turn, he told me that the Village had been working with its retained engineer for at least five (5) years regarding the toxic plume upgradient to the Village.  I then advised the Mayor that there was a good chance under Judge Feuerstein's decision that the Village was already time barred from bringing any action against the Potentially Responsible Parties.  Within 48 hours, the Executive Committee of the NCVOA requested that I add their organization as a party to the Amicus Brief.

13.    NG alleged that the Amicus Brief I prepared was filed "putatively on behalf of three organizations". (NG's Memo ¶ 1).   At this point in time, however, it is apparent that I am uniquely qualified to do so.  Consequently, the Amicus Brief I prepared was hardly an "extension" of the Brief filed by counsel of record on this appeal, Weitz & Luxenberg.  Rather, it is the product of my thirty years of experience in this industry and a trusted voice for all adversely impacted by Judge Feuerstein's decision.

14.    For all the above reasons, the Brief for the three Amicus must stand. These organizations collectively represent all of the municipal water providers on Long Island. They cannot be deprived of their choice of counsel simply because I am general counsel to the one member who has been most grievously injured by NG.

Some providers stand directly in the Plaintiff's shoes. Some, like the Village of Farmingdale, have already commenced preliminary engineering.[4] Some have not done so but must seriously consider postponing those investigations given the chilling effect of Judge Feuerstein's decision. All of these water providers cannot be denied the counsel they believe can best represent their interests and the millions of taxpayers for whom they are "trustees".

15. In turn, NG should be given due time to respond to the merits of those issues not presented by W & L which I raised in the Amicus Brief. These include:

> (a) the Magistrate's failure to appreciate the District's limited usufructuary rights which, together with her misapplication of Jensen, lead to her incorrect conclusion that the District was first injured at an earlier time when NG first polluted the aquifer;

> (b) the Magistrate's improper commingling of this Court's definition of "capture zone", as water being drawn from the well head into the treatment center, and H2M's use of the term "zone of capture", which refers to the "conical sphere of influence" which creates a water table draw down at a substantial distance from the well head;

---

[4] While Judge Feuerstein's decision only has precedent in the Eastern District of New York, the decision by this Court covers the entire Second Circuit encompassing all of New Jersey as well. Like Long Island, the eastern half of New Jersey is comprised of a sole source aquifer practically identical to Long Island. The water providers there stand in the same shoes as the amicus here with respect to advancing toxic plumes. Their Superintendents face the same duty as ours to take proactive steps to safeguard their wellheads before a plume strikes. New Jersey statutes, Chapter 10 Safewater Drinking Act, Subchapter 7:10A-1.12(d), Consequently, the New Jersey DEP filed an amicus brief with this Court on behalf of New York City in the MTBE litigations. 2011 WL 4439477.

(c)   that NGs arguments on this appeal are the identical arguments raised by Exxon in <u>MTBE</u> which were twice rejected by Judge Scheindlin and this Court;

(d)   the Magistrate's wrongful extension of the Reasonable Water Provider ("RWP") standard to the massive amounts of TCE in the OU3 plume where the RWP rule has (1) only been applied in the <u>MTBE</u> litigations and (2) only because of the "taste and smell" characteristics of this unique chemical which prove to have an "injurious" impact on the "confidence" of the drinking public even when the level of MTBE is under the MCL.

16.    Finally, upon information and belief, it is the discussion by the Amicus regarding NG's new concession which is the principal driving force in its motion to vacate our brief.  W & L did not address NG's concession that Judge Scheindlin's <u>MTBE</u> decisions exclude preliminary engineering as an accrual trigger for CPLR 214(c)(2).  Nor did W &L address NG's belated attempt to distinguish "construction costs" from engineering costs as an accrual trigger for the statute of limitations.

17.    Consequently, Should NG be successful in vacating the Amicus Brief, it will strike these vital arguments from the record. To that end, this Court must sustain the Amicus Brief and afford NG a full opportunity to clarify its distinction between engineering and construction costs as accrual triggers for CPLR 214(c)(2) -- a distinction not raised before the Magistrate or Judge Feuerstein below.

18.    It is also apparent that NG did not present this new accrual distinction to Judge Bianco.  The principal reason that the three Amicus held back on filing their

Brief was a good faith belief that Judge Bianco would issue a statute of limitations decision contrary to Judge Feuerstein. The Judge took oral argument on March 29 reinforcing our belief that a decision would be timely issued.[5]

19.     NG's failure to communicate with Judge Bianco its abandonment of the "preliminary engineering" accrual for CPLR §214(c)(2) is a matter best left to their professional discretion.  NG's statement to this Court that Judge Bianco's decision is not "relevant" to the pending appeal is beyond the pale. NG's Memo, fn. 9:

> It is charitable, rather presumptions of Mr. Ingham to presuppose a District Court decision which may well have had no actual bearing on the merits of this appeal.

20.     I am certainly not "presupposing" that Judge Bianco's decision is wholly relevant to the pending appeal.  Nor did this Court in granting the Amicus motion for a late filing on "good cause shown".  In fact, it is NG itself who based its motion to dismiss TOH's case on statute of limitations grounds solely upon Judge Feuerstein's decision in *Bethpage Water District*. See, No. CV 13-6362 (E.D.N.Y. Feb 29, 2016)(relevant portions of NG's motion pertaining to the statute of limitations defense are annexed hereto as Exhibit "B".)

---

[5]  Judge Bianco initially issued his briefing schedule on November 30, 2016 setting oral argument for March 29, 2017.  Following the schedule, the parties' original motions were submitted to Judge Bianco before February 22, 2017, thus, triggering our good faith belief that a decision would be forthcoming before this Court noticed oral argument herein.

21.     With respect to the word count applicable under FRAP 29 (a)(5), the Amicus inadvertently believed that the word limit was 7,500 words. Given that there were three Amicus submitting a combined brief, apparently this Court was generous in allowing the additional word count.

22.     However, in response to NG's demand, and in full compliance with the Rules, the Amicus has respectfully filed a companion cross-motion requesting that this Court replace the currently filed brief with one which now stands at 6,481.

I declare under penalty of perjury under the laws of the United States of American that the foregoing is true and correct.

Dated:  Farmingdale, New York
        September 12, 2017

_____
MICHAEL F. INGHAM

**EXHIBIT A**

# REPRESENTATIVE LITIGATION
(chronological)

## Municipal

Boyce v. Jericho Water District, Supreme Court Nassau County, Index Number 008201/16 Successful defense of Election Law Petition to place purported candidate demanding to be placed on the ballot for Water District Commissioner. Succeeded in obtaining order rejecting the application.

Westchester Joint Water Works v. Con Edison Company of New York, Supreme Westchester, Index Number 50151/15: Action in continuing trespass and negligence to recover costs for forced relocation of major water transmission main.

Jericho Water District v. U.S. Tank Painting, Inc. and American Casualty Ins. Co., Eastern District of New York, Docket No. CV-11 3601(June 6, 2011): Action to enforce maintenance bond for faulty tank painting.

Jericho Water District v. One Call Users Council, 10 N.Y.3d 385 (Ct. App. 2008): Status of District's rights under General Business Law §763.

Heller v. South Farmingdale Water District, Index No.: 21870/2007 (Justice Davis, Supreme Nassau, January 2008):  Tax payer lawsuit under State Finance Law §123-b.

Margolin v. Gatto and Village of Farmingdale, Index No.: 018019/01 (Justice Martin, Supreme Nassau, June 12, 2008): Court adjudicates right to municipal property and abandonment of streets  under Highway Law § 205. Affirmed 70 A.D.3rd 1014 (2nd Dept. 2010).

Massapequa Water District v. New York SMSA Limited Partnership, Index No.: 13984/2007 (Justice Woodard, Supreme Nassau, March 6, 2008): Declaratory judgment adjudicating  District rights to control infrastructure repairs.

Bethpage Water District v. New York State Department of Health and Nassau County Health Department , Index No.; 4904-08 (Justice Connolly, Albany County ):Declaratory judgment action regarding standing of Article 13 Commissioner Elected Water Districts and New York State preemption under Public Health Law §226(3) to establish public drinking water standards for chlorination waiver's.  Affirmed, 67 A.D.3rd 1088 (3rd Dept. 2009).

All County Paving Co. v. South Farmingdale et al., Index No.: 003861/05(Justice Woodard Supreme Nassau, April 25, 2005): District prevails in rejecting contractor as "inexperienced" bidder on water main replacement project.

Peter v. Massapequa Water District, 1 Misc.3d 130 (App. Term 2003): Appellate Term affirms legal presumption favoring District in accuracy of meter reading.

Middendorf v. Jericho Water District, Index No.: 17070/2003 (Justice Adams Supreme Nassau, August 4, 2008): Summary judgment dismissing "whistle blower" claim instituted by terminated probationary employee.

Town of Hempstead v. Lizza Indus. Inc, 267 A.D.2d 300, 699 N.Y.S.2d 884(2nd Dept 1996): Appellate Division awards the Town standing to sue contractors under Nassau County Sewer Contracts.

Suffolk County Water Authority v. J.D. Posillico, Inc., 191 A.D.2d 423, 593 N.Y.S.2d 998 (2nd Dept 1993): Appellate Division preserves SCWA's standing as protected Third-Party Beneficiary under Suffolk County's construction contracts.

Blessi v. Andruzzi, 173 A.D.2d 584, 570 N.Y.S.2d 168 (2nd Dept 1991): Declaratory judgment determining statutory rights under Town Ordinances and General Municipal Law § 136, "junk yard" law.

Bensin Contracting, Inc. v. South Farmingdale Water District et al., Index No.: 30069/98 (Justice Carter, Supreme Nassau, June 23, 1991): Supreme Court preserves District's rights to assign bids under General Municipal Law §103.

Bethpage Water District v. Hendrickson Brothers, 138 A.D.2d 660, 526 N.Y.S.2d 476 (2nd Dept 1988): Affirms unanimous jury verdict for water main damages.

Bethpage Federal Credit Union v. Greco, 137 A.D.2d 816, 525 N.Y.S.2d 279 (2nd Dept 1988): Appellate Division affirms District's right to control water main extensions under Town Law §199.

## Insurance Coverage

Bethpage Water District v. Continental National Assurance ("CNA") Co., 154 A.D.2d 637, 546 N.Y.S.2d 645 (2nd Dept 1989): Appellate Division affirms District's right to collect full  amount of damages against contractor's insurance policy with only one deductible.

Town of Islip v. S. Zara and Sons Contracting Co. Inc., 207 A.D.2d 339, 615 N.Y.S.2d 428 (2nd Dept.1994): Court preserves Town's rights against contractor's insurance policy.

Port Washington Water Pollution Control District v. American Alternative Insurance Company, Index No. 604989/2014 (Nassau Cty. Supreme). The action seeks a declaration that the District's Comprehensive General Liability Policy covers collapse damage to a sewer force main caused by gradual pressure from an overlying Nassau County stone revetment.

**EXHIBIT B**

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

-------------------------------------------------------X

TOWN OF HEMPSTEAD,                          Civil Action No. 2:16-cv-03652-JFB-SIL

        Plaintiff,

    -against-

UNITED STATES OF AMERICA, et al.,

        Defendants.

-------------------------------------------------------X

## NORTHROP GRUMMAN CORPORATION'S AND NORTHROP GRUMMAN SYSTEMS CORPORATION'S REPLY MEMORANDUM IN SUPPORT OF THEIR MOTION TO DISMISS PLAINTIFF'S COMPLAINT

Mark A. Chertok
Elizabeth Knauer
SIVE, PAGET & RIESEL, P.C.
460 Park Avenue
New York, N.Y. 10022
Telephone: (212) 421-2150
Facsimile: (212) 421-1891
Email: mchertok@sprlaw.com
      eknauer@sprlaw.com

Frank Leone (*pro hac vice*)
Stephen J. Darmody (*pro hac vice*)
HOLLINGSWORTH LLP
1350 I Street, N.W.
Washington, D.C. 20005
Telephone: (202) 898-5800
Facsimile: (202) 682-1639
Email: fleone@hollingsworthllp.com
      sdarmody@hollingsworthllp.com

*Attorneys for Defendants Northrop Grumman
Corporation and Northrop Grumman Systems
Corporation*

## I.     INTRODUCTION

As discussed more fully below, the Town's[1] tort claims are time-barred because its own documents demonstrate that contaminants in excess of "trigger values" were present in wells, which caused it to take action to address that contamination, more than three years before the Complaint was filed. In addition, all of the Town's claims should be dismissed because it has failed to allege sufficient facts to support any plausible claim against Northrop Grumman. Even if the Town's CERCLA claims are not dismissed, they should be stayed because NYSDEC, which has been overseeing environmental remediation at the Site for three decades, has primary jurisdiction to address the Town's alleged injuries.

## II.    THE TOWN'S TORT CLAIMS ARE TIME-BARRED.

The Town's tort claims are subject to a three-year limitations period.[2] The Town's own documents demonstrate that contaminants in excess of the PWSCP's "trigger values" were found in outpost monitoring wells (OPMWs) associated with Well 13 by July 12, 2012, and in Wells 7A/8A by February 7, 2013.[3] Both of those dates occurred more than three years before the Complaint was filed on July 3, 2016. The Town then used these same data to justify the installation of its treatment system.[4] But the Town now urges that, because the levels of contaminants on those dates were below the Safe Drinking Water Act's Maximum Contamination Levels (MCLs), they did not trigger the limitations period.[5] The Second Circuit

---

[1] Northrop Grumman incorporates herein the definitions of all terms defined within its motion to dismiss.

[2] N.Y. C.P.L.R. § 214-c(2).

[3] *See* ECF No. 67-2 at Page ID#s 2211, 2256.

[4] *See id.*

[5] Opp'n at 19, 20 (citing *In re Methyl Tertiary Butyl Ether (MTBE) Prods. Liab. Litig.*, 725 F.3d 65 (2d Cir. 2013)).

1

has held, however, that "the MCL does not define whether an injury has occurred." *In re MTBE*, 725 F.3d at 105. The Town is asking this Court to find that a concentration of contaminants below MCLs is sufficient to justify the installation of a treatment system but not sufficient to start the limitations clock. This Court has previously rejected that argument.[6] In that case, the Court held that the water district's tort claims were barred by § 214-c(2) because the water district knew of contamination "hot spots" near its wells' intake screens more than three years before it filed suit, and determined that it needed additional treatment at its water treatment plant. The water district had argued that high levels of contamination in a well's "capture zone" that had not actually been detected in the well were not an "actual injury" that would start the limitations period. *Id.* at *35. Rejecting that argument, this Court held that whether contaminants are in a well at any specific concentration is not determinative. *Id.* at *35–36. Rather, the statute begins to run when "a reasonable water provider" would "take action to protect the water supply." *Id.* at *35. The *Bethpage Water District* court then concluded that the water district was "long on notice of the injury . . . and it cannot change history to allege that it was (and apparently alleges that it remains) unaware of statute-triggering injury." *Id.* at *37.

The Town's analogous position here that concentrations below the MCL justify the installation of a treatment system (and this lawsuit), but do not trigger § 214-c(2) is another "confusing twist of logic." *Id.* at *38. The Town has known since 2001 that its wells might be contaminated and has long sought to protect itself from that contamination. In fact, the Town submitted a letter to NYSDEC, explaining that it was "concerned" that modeling "had not adequately determined the extent of the off-site groundwater plume" and "highly contaminated

_____

[6] *See Bethpage Water Dist. v. Northrop Grumman Corp.*, No. CV 13-6362 (SJF)(AYS), 2016 U.S. Dist. LEXIS 25554, at *32–33 (E.D.N.Y. Feb. 29, 2016), *report & recommendation adopted*, 2016 U.S. Dist. LEXIS 43720 (E.D.N.Y. Mar. 31, 2016).

2

groundwater could exist south" of the plume's predicted edge, "which could threaten public water supply[] wells."[7] Ltr. from Comm'r Arnold Palleschi (Feb. 5, 2001) (Ex. 1 to Supp. Decl. of Frank Leone in Support of Northrop Grumman's Reply). Pursuant to its duty under New York law to monitor the quality of the aquifer, the Town later obtained data demonstrating the presence of contaminants in concentrations greater than the PWSCP's trigger values by July 12, 2012 for the OPMWs associated with Well 13, and by February 7, 2013 in Wells 7A/8A. *See* NG's Mot. at 4–6. With these data in its possession, the Town "as a [putatively][8] responsible water provider . . . was undeniably in possession of facts" that caused it to take action and "those same data triggered the running of the statute of limitations." *Bethpage Water Dist.*, 2016 U.S. Dist. LEXIS 25554, at *43. Here, the Town of Hempstead understood the data in its possession as of 2012 and early 2013, and acted on them. By not filing its Complaint until July 3, 2016, it failed to file within the three-year limitations period and "cannot now credibly claim that it lacked sufficient knowledge for the limitations period to begin." *Id.* at *43–44.

III.   THE TOWN FAILS TO STATE PLAUSIBLE CLAIMS
       AGAINST NORTHROP GRUMMAN.

       A.   The Town Has Not Alleged a Plausible CERCLA Claim.

       To state a claim under CERCLA, the Complaint must allege sufficient facts to allow a plausible conclusion that it complied with the NCP. It has not done so. The sum total of the Complaint's NCP allegations is contained in one conclusory sentence: the Town's costs "were

---

[7] *Cf. Bethpage Water Dist.*, 2016 U.S. Dist. LEXIS 25554, at *40–41 (noting the plaintiff's longstanding criticism of groundwater model in holding tort claims based on groundwater contamination time barred).

[8] Northrop Grumman does not concede that the Town was reasonable in determining that the actions it took were necessary, but that is necessarily the Town's position, which is not disputed here for purposes of this motion. In the unlikely event that the Town's tort claims are not dismissed as time-barred, Northrop Grumman reserves all arguments concerning the reasonableness of the Town's actions.

**EXHIBIT C**

No.  16-2592

IN THE
UNITED STATES COURT OF APPEALS
FOR THE SECOND CIRCUIT

BETHPAGE WATER DISTRICT,

        Plaintiff-Appellant,

v.

NORTHROP GRUMMAN
CORPORATION,
NORTHROP GRUMMAN
SYSTEMS
CORPORATION,

        Defendants-Appellees.

On Appeal from the United States District Court
for the Eastern District of New York

No. 2:13-CV-06362

The Honorable Sandra J. Feuerstein,
    United States District Judge

**MEMORANDUM IN REPLY TO DEFENDANTS-APPELLEES'
MOTION TO VACATE THE AMICUS BRIEF FILED ON BEHALF OF
LONG ISLAND WATER CONFERENCE, NASSAU SUFFOLK WATER
COMMISSIONERS ASSOCIATION AND THE NASSAU COUNTY VILLAGE
OFFICIALS ASSOCIATION IN SUPPORT OF PLAINTIFF-APPELLANT**

## PRELIMINARY STATEMENT

Pursuant to this Court's order dated August 25, 2017, the Long Island Water Conference ("LIWC"), the Nassau Suffolk Water Commissioners Association ("NSWCA") and the Nassau County Village Officials Association ("NCVOA") filed an Amicus Curiae Brief in support of Plaintiff-Appellant. The Defendant-Appellee Northrop Grumman Corporation ("NG") has moved to vacate the Amicus Brief. However, NG has failed to support its requested relief.

## POINT I

## GOOD CAUSE SHOWN FOR LATE FILING

There is no question that good cause has been shown for the late filing of the Amicus Brief. The Advisory Committee notes under FRCP 29 are instructive:

> The former rule's statement that a court may, for cause shown, grant leave for later filing is unnecessary. Rule 26(b) grants general authority to enlarge the time prescribed in these rules for good cause shown. This new rule, however, states that when a court grants permission for later filing, the court must specify the period within which an opposing party may answer the arguments of the amicus (emphasis added).

First, as this Court has already granted the Amicus leave, it has determined the motion demonstrated "good cause" to sustain a late filing.

Second, the good cause here was clear and substantial. As set forth in the original motion for leave, NG made an identical motion to dismiss in the Town of

2

Hempstead Water Department's ("TOH") pending toxic tort claim in Town of Hempstead v. United States of America, Index # 2:16 cv 03652. In fact, NG premised its statute of limitations motion predominantly, if not totally, upon Judge Feuerstein's decision in Bethpage Water District, No. CV 13-6362 (E.D.N.Y. Feb 28, 2016).[1] Consequently, any decision by Judge Bianco concerning Judge Feuerstein's prior decision would be immensely relevant[2] to the Plaintiff's pending appeal. While this Court's prior determination that the Amicus filing demonstrated good cause, NG's near complete reliance on Judge Feuerstein's decision in its TOH motion to dismiss is conclusive.[3]

Third, under FRAP 29 (a)(2) there are two methods of filing an Amicus brief. The first requires notice and consent from all parties. The second permits the Amicus to move for leave directly to the Court on "good cause shown". It is also

---

[1] Declaration of Michael F. Ingham dated September 12, 2017 ("Ingham Dec.") (relevant portions of NG's TOH Brief annexed as Exhibit B).

[2] Ingham Declaration ¶ s 16-20.

[3] The cases cited by NG in support of its motion to vacate the Amicus Brief are distinguishable and inapposite. NG's reference to In re Calpine Corporate, 2008 WL 2462035 (S.D.N.Y. 2008) is misplaced. Unlike the appeal at bar, in that case a late filing by the amicus was denied because there was "no explanation of why it should grant leave for such a delayed filing". In State of Connecticut v. American Electric Power Company, Inc. 528 F.3d 309 (at fn 2)(2nd Cir. 2009), was selective in its rejection in Senator Inhofe's Amicus brief. First, two other Amicus briefs ostensibly setting forth the same arguments as the Senator were accepted as timely rendering Mr. Inhofe's brief superfluous. Second, it appears that Senator Inhofe offered no good cause for his late filing. Next, in LaRoe v. DeWolff, Boberg& Associates, Inc., 458 F.3d 359 (4th Cir. 2006), the then Secretary of Labor was permitted to file a late Amicus brief, even at the near argument stage of the brief. However, the Court admonished the Secretary from cherry-picking the venue of his amicus filings and that his repeated lateness was "a discourtesy both to the parties in that case and to the court". P. 361.

apparent under Rule 29(a)(3) that notice to any party is not required. However, as indicated in the Advisory Committee notes, once "permission for later filing" is granted under the "good cause" alternative, "[t]he Court must specify the period within which an appealing party may answer the arguments of the Amicus" which the Court will do at this juncture.

## POINT II

## MEMBERSHIP DUES

The Bethpage Water District ("BWD" or "District") admits that it pays membership dues to both the LIWC and the NSWCA. NG contends that these membership dues constitute a violation of FRAP 29(a)(4)(E)(iii) in that they somehow "funded" the Amicus Brief. NG is incorrect. As the Advisory Committee Notes state:

> A party's or counsel's payment of general membership dues to an amicus <u>need not be disclosed</u>. Subdivision (c)(5) also requires amicus briefs to state whether any other "person" (other than the amicus, its members, or its counsel) contributed money with the intention of funding the brief's preparation or submission, and, if so, to identify all such persons. "Person", as used in subdivision (c)(5) includes artificial personas as well as natural persons. (emphasis added).

This rule is hardly surprising as a trade organization often comes to the aid of one of its aggrieved members with the resources to support an amicus filing. No one other than the LIWC and the NSWCA contributed to the funding of the Amicus

4

Brief. [4]   As noted in the Advisory Committee Notes, the $20,000 contributed by these two organizations allows this Court to "assess whether the Amicus itself considers the issue important enough to sustain the cost and effort of filing an amicus brief".

## POINT III

## COOPERATION BETWEEN THE PARTY'S COUNSEL OF RECORD AND COUNSEL FOR THE AMICUS IS ENCOURAGED.

One of NG's principal objections to the filing of the Amicus Brief is the close cooperation between W & L and counsel for the Amicus.   This objection is unfounded as the Advisory Committee Notes that such coordination is "desirable" to avoid "duplication" of arguments.  Indeed, brief sharing itself is allowed, commonly practiced, and "need not be disclosed".

> It should be noted that coordination between the amicus and the party whose position the amicus supports is desirable, to the extent that it helps to avoid duplicative arguments. …. [M]ere coordination--in the sense of sharing drafts of briefs--need not be disclosed under subdivision (c)(5). Cf. Eugene Gressman et al., Supreme Court Practice 739 (9th ed. 2007) (Supreme Court Rule 37.6 does not "require disclosure of any coordination and discussion between party counsel and amici counsel regarding their respective arguments ...").

---

[4]  Ingham Declaration ¶10.

NG's objection to the Amicus and W &L working together is a non-starter. Indeed, even if I had assisted W & L with drafting the main briefs, such cooperation is fully acceptable under FRAP.[5] Consequently, the Amicus Brief cannot be defined as a poorly veiled attempt "by BWD to supplement its two previous briefs". NG Memo, p. 1. Every effort was made by the Amicus to raise new arguments not raised in the main brief.[6]

## POINT IV

## FULL COMPLIANCE WITH F.R.A.P. 29(a)(4)(F)(5) LENGTH.

The Amicus inadvertently breached the word counts set forth in Rule 29. It is apparent that the Court may have accepted the additional word count as three amici joined in one brief. However, pursuant to NG's request for strict compliance with the Rules, we have respectfully submitted a companion cross-motion[7] requesting that the Court accept a corrected brief which is 6,481 words.

---

[5] NG is completely off base in labeling the Amicus Brief a "surreptitious" filing. NG Memo at 4. NG is completely familiar with counsel for the Amicus through the pre-appeal settlement conferences and emailed our office within hours of the filing to inquire if we would oppose its motion to vacate. Contrary to NG, I did not "represent" BWD at these conferences. NG Memo at 5. As a courtesy, I was invited to attend by W & L with no objection from NG. Finally, NG does not allege that I violated any of the conference rules (which I did not) nor that my attendance at same enhanced the Amicus Brief (which it did not).

[6] Ingham Declaration ¶s 15-20.

[7] Id. at ¶s 21 & 22.

6

## **POINT V**

## **ACTUAL PRACTICE UNDER F.R.A.P. 29 (a)(4)(E)**

After review of the relevant case law in the various Circuit Courts, it is now apparent that FRAP 29(a)(4)(E)(i) has been all but abandoned "in practice". Under Rule 29(a)(4)(e), it is appellate counsel of record who may not:

(i)     Author the brief in whole or part;

(ii)    Contribute money to the funding of the Brief.

The reason for these rules is to discourage, if not prohibit, the counsel of record from soliciting amicus, paying them to participate and actually writing the Amicus Brief itself.   NG cites to <u>Glassroth v. Moore</u>, 347 F.3d 916 (2003)("<u>Glassroth</u>").  In that case, the Eleventh Circuit was confronted with a request for attorney fees under 42 USC §1983. The lead counsel for plaintiff requested attorneys' fees for work she did "working on, supervising, and reviewing the Amicus Brief".  <u>Id</u>. at 918-19.  Commenting on this request for "additional work" on behalf of the Amicus, the <u>Glassroth</u> Court noted the common practice of the "attorney of record".  <u>Id</u>.

> It comes as no surprise to us that attorneys for parties solicit amicus briefs in support of their position, nor are we shocked that <u>counsel for a party</u> would have a hand in writing an amicus brief. In fact, we suspect that amicus briefs are often used as a means of evading the page limitations on a party's briefs. *See Voices for Choices v.*

7

*Illinois Bell Tel. Co.,* 339 F.3d 542, 544 (7th Cir.2003)
(Posner, J., in chambers) ("[A]micus briefs, often solicited
by parties, may be used to make an end run around court-
imposed limitations on the length of parties'
briefs.")(emphasis added)

Failure to be "surprised" is one thing. Condoning the conduct as routine is
another thing. Indeed, the Eleventh Circuit would not prohibit the practice by the
counsel of record for the party actually writing the Amicus Brief. Instead, it simply
would not authorize payment for that work under Section 1983. Id. at 819 (emphasis
added):

> Even where such efforts are successful, however, they
> should not be underwritten by the other party. <u>An
> organization or group that files an amicus brief</u> on the
> winning side is not entitled to attorney's fees and expenses
> as a prevailing party, because it is not a party. We will not
> allow that result to be changed by the simple expedient of
> having <u>counsel for a party</u> do some or all of the amicus
> work. To pay a party for such work would encourage the
> practice, which we are loathe to do. The district court
> should not award plaintiffs any attorney's fees or expenses
> for work done in connection with supporting amicus
> briefs.

In fact, it is apparent that all of the Circuits on record on this issue authorize
the counsel of record to at least assist, if not actually draft, the Amicus Brief. The
only "split" in the Circuits is authorization to fund this work for the Amicus under
Section 1983.

8

The first District Court to object to, and explicitly reject, the funding constraints in <u>Glassroth</u> was Judge Kern in <u>Bishop v. Smith</u>, 112 F. Supp 3d 1231 (N.D. Oklahoma 2015)("<u>Bishop</u>") noting that <u>Glassroth</u> represented the minority view. <u>Id</u>. at 1246:

> If and to the extent *Glassroth* creates a bright-line rule excluding all time spent on activities "in connection with" supporting amicus briefs, the Court rejects *Glassroth.* The *Glassroth* court cited a decision authored by Judge Richard Posner, *Voices for Choices v. Illinois Bell Telephone Company,* 339 F.3d 542, 544 (7th Cir.2003), in which the court denied motions for leave to file amicus briefs. Judge Posner is known as "a particularly prominent critic" of amicus briefs advocating for one party, which have been termed "friend of a party" briefs. *See* Helen A. Anderson, *Frenemies of the Court: The Many Faces of Amicus Curiae,* 49 U. Rich. L.Rev. 361, 364, 396 (2015) (explaining various types of amicus briefs and Judge Posner's hostility toward "friend of a party" briefs). The Court does not share this hostility, and it does not appear to be a majority position. *See id.* at 415 (concluding that "on the whole, judges—even those with the greatest number of amicus filings—do not seem overly concerned about amici curiae abuse of their positions"). Nor has the Tenth Circuit expressed hostility toward amicus briefs. Therefore, *Glassroth's* reasoning regarding fee-shifting is at least partially grounded in a limited (and perhaps minority) view of the proper role of supporting amicus briefs in modern legal practice.

The liberal attitude[8] for Amicus briefs was recounted by the 3rd Circuit in Neonatology Associates, P.A. v. C.I.R., 293 F.3d 128, 133 (3rd Cir. 2002)("Neonatology").

> In addition, because private amicus briefs are not submitted in the vast majority of court of appeals cases, and because poor quality briefs are usually easy to spot, unhelpful amicus briefs surely do not claim more than a very small part of a court's time. For all these reasons, I think that our court would be well advised to grant motions for leave to file amicus briefs unless it is obvious that the proposed briefs do not meet Rule 29's criteria as broadly interpreted. I believe that this is consistent with the predominant practice in the courts of appeals. *See* Micael E. Tigar and Jane B. Tigar, FEDERAL APPEALS—JURISDICTION AND PRACTICE 181 (3d ed. 1999)("Even when the other side refuses to consent to an amicus filing, most courts of appeals freely grant leave to file, provided the brief is timely and well-reasoned."); Robert L. Stern, *supra,* at 307–08.(footnote omitted).

Finally, this year a true split developed between the 11th Circuit and the 5th Circuit as demonstrated by Deleon v. Abbott, 687 Fed. Appx. 340 (5th Circ. 2017)("Deleon"). While the majority of the Deleon Court sanctioned the lower court's award of Section 1983 payments to the parties' counsel of record, it did so

---

[8] Past New York State Court of Appeals Chief Judge Judith Kaye expressed the same support for amicus in general as "Amici—because they have a wider perspective, or simply a different perspective—can be of an inestimable value to the Courts in discharging their responsibility that extends beyond the litigants". See, Is New York State Court of Appeals Still Friendless, an Empirical Study of Amicus Curiae Participation. 72 Alb. L. Rev. 701.

in the face of a strong descent by Judge Elrod on the principals enunciated in Glassroth.

## POINT VI

### UNDER F.R.A.P. 29(a)(4)(E), THE REFERENCE TO "PARTY'S COUNSEL"MEANS COUNSEL OF RECORD

NG's principal objection lies with the fact that the author of the Amicus Brief is also general counsel to the BWD. As with all of the issues raised above, service as general counsel to the District does not disqualify service as counsel to the Amicus. As stated in the Rule 26.1 Disclosure Statement, standing to represent the Amicus is founded on service as the pro bono general counsel to the LIWC. Indeed, there is no case law which automatically excludes general counsel for a party from serving as the legitimate counsel for the amicus, and NG has cited none.

There is no case law on the issue because these two respectable capacities serve distinct and independent roles. It is only the counsel of record which qualifies as the "party's counsel" under FRAP 29(a)(4)(E)(i)(ii). In fact, the Rules in that Section distinguish between the "parties' counsel" of record and the counsel for the Amicus in FRAP 29(a)(4)(E)(iii):

> A person – other than the amicus curiae, its members, origin counsel- contributed money – that was intended to fund preparing or submitting the brief…

11

Relevant case law, together with the Advisory Committee Notes, clearly indicate that only the counsel of record is encompassed by Rule 29. Glassroth consistently cites "lead counsel for the Plaintiffs" as "the counsel for a party" which should not be paid for amicus work.

Weitz and Luxenberg, P.C. ("W & L") have been the District's counsel of record during all the prior proceedings in this case as well as on this appeal itself. There is no question that I have consulted with W & L and their attorneys during the progress of the litigation which is clearly my obligation as general counsel to the District. As stated in Rule 26.1 Disclosure Statement, W&L did not solicit the Amicus. Nor did they fund the Amicus Brief in any way.

Instead, the funding of the Amicus Brief was paid solely by the LIWC and the NSWCA. While the practical rules in Glassroth, Bishop and Neonatology would condone the practice of W & L actually drafting the Amicus Brief, that certainly did not happen in this case. There was no participation by W & L in writing this Amicus Brief whatsoever. As I did not even share a phone call with their attorneys in this regard, I am certain they were as surprised as NG when the Amicus Brief was filed on August 25, 2017. Having assiduously comported with the Rules, there is no reason to disqualify counsel for the Amicus simply because of his dual service as general counsel to the Appellant.

Dated: Farmingdale, New York
      September 12, 2017

Respectfully submitted,

_____

Michael F. Ingham
CARMAN, CALLAHAN & INGHAM, LLP
266 Main Street
Farmingdale, New York 11735
516-249-3450
*Counsel for Amicus Curiae*
Long Island Water Conference
Nassau Suffolk Water Commissioners Association
Nassau County Village Officials Association

**EXHIBIT D**

*Proposed Amended Brief for Amicus Curiae*

# 16-2592-cv

IN THE

## United States Court of Appeals

FOR THE SECOND CIRCUIT



BETHPAGE WATER DISTRICT,

*Plaintiff-Appellant,*

*v.*

NORTHROP GRUMMAN CORPORATION,
NORTHROP GRUMMAN SYSTEMS CORPORATION,

*Defendants-Appellees.*

*On Appeal from the United States District Court
for the Eastern District of New York (Central Islip)*

## BRIEF ON BEHALF OF LONG ISLAND WATER CONFERENCE, NASSAU SUFFOLK WATER COMMISSIONERS' ASSOCIATION AND NASSAU COUNTY VILLAGE OFFICIALS ASSOCIATION AS *AMICUS CURIAE*

Michael F. Ingham
CARMAN, CALLAHAN & INGHAM, LLP
*Attorneys for Long Island Water Conference,*
  *Nassau Suffolk Water Commissioners' Association*
  *and Nassau County Village Officials Association*
  *as Amicus Curiae*
266 Main Street
Farmingdale, New York 11735
516-249-3450

## RULE 26.1 DISCLOSURE STATEMENT

The Long Island Water Conference is not a publicly traded corporation. It has no parent corporation and there is no public corporation that owns 10% or more of its stock.

The Nassau Suffolk Water Commissioners Association is not a publicly traded corporation. It has no parent corporation and there is no public corporation that owns 10% or more of its stock.

The Nassau County Village Officials Association is not a publicly traded corporation. It has no parent corporation and there is no public corporation that owns 10% or more of its stock.

# **TABLE OF CONTENTS**

INTEREST OF AMICUS CURIAE………………………………………….1

PREAMBLE…………………………………………………………………….1

POINT I

Accrual of CPLR 214-c (2) Requires Exposure to Contamination,
"Specifically the Migration of TCE into the Well Head"………………………….7

    A.    There is no Statute of Limitations Triggering Injury
           until there is Contamination at the Well Head………………………..7

    B.    The Magistrate's Compound Error Lies in Her Failure to
           Appreciate the District's Limited Usufructuary Rights to the
           Aquifer and Her Misapplication of Jensen…………………………...9

    C.    The Magistrate Committed Reversible Error When She
           Determined that the Contamination Was in the Plant
           4 Well's "Capture Zone"……………………………………………12

POINT II

The Accrual Rules Established in the MTBE Multi District Litigations
Control the Outcome of this Case…………………………………………………15

    A.    Judge Scheindlin Rejects the Argument that "knowledge" of the
           Upgrading Plume Triggers Accrual of CPLR 214-c (2)…………......15

    B.    Judge Scheindlin Also Rejects the Argument that
           "Anticipatory Action" to Ameliorate the Effects of a
           Contamination Accrue CPLR 214-c (2)……………………………..15

POINT III

The "Reasonable Water Provider" Rule Only Applies (i) When There Has Been Contamination of The Property Interest At Issue, and (ii) Only To The Extent of Determining Whether Such Contamination Reaches The Level Of Injury ……..20

    A.    MTBE XIII is the Only Court to Ever Use the RWP Standard ……20

    B.    The MTBE Standard Is Only Applicable When there is at Least Some Cognizable Level of Contamination in the Wellhead…………………………………………………....20

    C.    The RWP Standard Is a Factual Test of Sufficiency Only Applicable in Cases where there is a "Grey Area" of Contamination Levels…………………………………………21

POINT IV

Judge Feuerstein's Decision Has Devastating Impact on All Long Island Water Providers…………………………………………………………….24

    A.    All Water Providers Have a Statutory and "Common Sense Obligation" to Protect their Wells in Advance of an Impending Upgradient Toxic Plume…………………………………………24

    B.    Under Judge Feuerstein's Decision, All of Long Island's Water Providers are Either Time-Barred or Face an Impossible Public Policy Dilemma…………………………………………25

# <u>TABLE OF AUTHORITIES</u>

## <u>Cases</u>

<u>In re Methyl Tertiary Beutyl Ether Prods. Liab. Lit.</u>,
2007 WL 1601491 (S.D.N.Y. 2007)……………………...……………………*passim*

<u>In re Methyl Tertiary Beutyl Ether Prods. Liab. Lit.</u>,
2009 WL2634749 (S.D.N.Y. 2009)…………………………………………….*passim*

<u>In re Methyl Tertiary Beutyl Ether Prods. Liab. Lit.</u>,
739 F. Supp.2d 756, 602 (S.D.N.Y. 2010)………………………………….. *passim*

<u>In re Methyl Tertiary Beutyl Ether Prods. Liab. Lit.</u>,
725 F.Supp 3rd 65 (2nd Cir. 2013)…………………………………………….*passim*

<u>Jensen v. General Elec. Co.</u>,
82 N.Y.2d 77, 81, 603 N.Y.S.2d 420 (Ct. App. 1993)……………………..7, 9, 10

<u>Suffolk County Water Authority v.  Dow Chemical Company</u>,
121 A.D.3d 50 ($2^{nd}$Dept. 2014)………………………………………………...11

## <u>Statutes</u>

CPLR §214-c (2)……………………………………………………………*passim*

## INTEREST OF AMICUS CURIAE

The Long Island Water Conference ("LIWC") is a trade organization whose members include Town Law, Article 13 Commissioner Elected Water Districts, Village Water Departments and Suffolk County Water Authority.[1] The Nassau Suffolk Water Commissioners' Association ("NSWCA") is comprised of duly elected Commissioners of the local water districts on Long Island.

The Nassau County Village Officials' Association ("NCVOA") is comprised of all 64 Incorporated Villages in Nassau County, a dozen of which operate their own water departments.

All water providers on Long Island derive their water supply from, what has been designated by the EPA, as the "sole source" aquifer. Consequently, all are united in interest in requesting that this Court fully apply its decision in In re Methyl Tertiary Beutyl Ether Prods. Liab. Lit., 725 F. Supp 3rd 65 (2nd Cir. 2013) ("MTBE"), to this appeal and reverse Judge Feuerstein's underlying decision.

## PREAMBLE

This is the second time that the Bethpage Water District ("BWD" or "District") Plant 4 facility has confronted potential contamination from Northrop

[1] The Plaintiff-Appellant's counsel of record on this appeal, Weitz & Luxemburg, P.C., did not author this brief in whole or in part. No party or parties' counsel contributed money intended to fund the preparation or submission of this brief. No person other than *amicus curiae*, its members or its counsel, contributed money that was intended to fund the preparation or submission of this brief. The author of this brief is general counsel to the Bethpage Water District. He is also pro bono general counsel to *amicus* LIWC which, together with the NSWCA, were the sole contributors to the funding of this brief.

Grumman's ("NG") operations. Plant 4 has two wells, both of which were contaminated in the 1990s by a toxic plume[2] denominated by the New York State Department of Environmental Conservation ("DEC") as Operable Unit 2 ("OU2"). On June 17, 1994, a settlement and release agreement ("Tolling Agreement")[3] was executed wherein NG agreed to pay for treatment upgrades to Plant 4 designed to remediate the OU2 contamination. As relevant here, the Tolling Agreement did not cover any future damages that might be caused by plumes which may arise in other parts of the District.[4]

The wells at Plant 4 are now in danger of being contaminated by a second, far more intense plume[5], containing TCE levels at over 10,400 µg/l.[6] This second plume, denominated by the DEC as OU3, originated on the "Former Grumman Settling Ponds" where NG dumped vast unknown quantities of industrial waste from 1949 to 1962 when the property was transferred to the Town. The OU3 plume was not identified by the DEC until 2005 and thus is explicitly excluded from the Tolling Agreement.

---

[2] The principal contaminant is trichloroethene ("TCE"), a volatile organic compound ("VOC") which is a carcinogen regulated by the DEC with a Maximum Contaminate Level ("MCL") at 5 µg/l. The symbol µg/l stands for parts per billion ("ppb").

[3] Appendix ("A") A-10-19 , particularly ¶4 subd.4.

[4] See A-623, lines 14-17 and p. 625, lines 3-17.

[5] Current levels of TCE from the OU2 plume have fluctuated around 200 µg/l.

[6] The vertical profile boring ("VPB") which "revealed levels of VOCs over 10,400 µg/l was located approximately 3500 feet upgradient of Plant 4." A-1760.

Even though NG identified the upgradient OU3 plume as merely an upgradient threat to the Plant 4 well site[7], NG conceded the District's standing and chose a litigation strategy which solely pursued a statute of limitations challenge based upon CPLR 214-c (2). However, NG never introduced any admissible evidence to sustain its burden of proof on this affirmative defense. Specifically, NG needed to prove that the District discovered, or reasonably should have discovered, that toxic contamination from the OU3 plume had actually injured the District's usufructuary right to pump the water from under Plant 4 prior to the statutory cutoff date of November 18, 2010. NG failed to do so.

Instead, NG argued that the District suffered "injury" to its property when the Settling Ponds initially polluted the upgradient ground water in the 1940s and 50s and that the statute of limitations was triggered (i) in 2007 when the District first discovered "knowledge" of the plume from the DEC; (ii) in 2008-9 when the District learned of contamination through Vertical Profile Borings ("VPBs") taken at locations upgradient from Plant 4; or, (iii) at the very latest, in November 2009 when the District took preventative action, specifically directing its engineers to design new treatment upgrades and by applying for municipal bonding financing from the Town of Oyster Bay[8].

_____

[7] NG's Statement of Undisputed Facts A-547-51.
[8]See, NG's Statement of Undisputed Facts A-551-559. See also, Def. MOL p. 20.

3

In response to NG's "anticipatory" upgradient accrual argument, the District contended that the statute of limitations under CPLR 214-c (2) never accrued, as a matter of law, as no OU3contamination had ever been detected in tests[9] of raw water samples taken "in the wellhead" at Plant 4.

In her Report and Recommendation to Judge Feuerstein, Magistrate Shields rejected the District's request for an "in the wellhead" accrual standard. Instead, the Magistrate accepted NG's argument that the limitations period accrued in November 2009 when the District knew that the upgraded OU3 plume was approaching Plant 4, expended money for its engineers to design the treatment facility and initiated municipal bonding to finance the upgrades which the District anticipated it would need in the event that OU3 actually hit Plant 4. Judge Feuerstein subsequently confirmed the Magistrate's Report and Recommendation (R & R) in "its entirety" in her final order dated July 11, 2016. A-1937-38.

As set forth herein, the "anticipatory" upgradient accrual rule adopted by the Magistrate and Judge Feuerstein violates every one of the contamination accrual rules established by the Courts in New York. Judge Scheindlin held that CPLR

---

[9] The Magistrate notes that the three VBPs at issue here were orders of magnitude higher than the OU2 readings and were all substantially upgradient of Plant 4.

4

214-c (2) cannot accrue, as a matter of law, if there are "no detections"[10] of contamination in tests taken of raw water samples at the wellhead at issue prior to the statutory cutoff date[11]. Applied to this case, CPLR 214-c (2) cannot accrue until sufficiently injurious levels of the OU3 toxic plume have been "detected" in the Plant 4 well heads.

Indeed, the arguments now raised by NG were the exact same arguments raised by Exxon in MTBE.[12] In two separate decisions, Judge Scheindlin explicitly rejected the arguments[13] that "knowledge" of a threat of contamination, and "preventative actions" taken in response to such a threat, trigger accrual of the statute of limitations for CPLR 214-c(2). See, MTBE (S.D.N.Y. 2009) 2009 WL2634749 ("MTBE IX") (pre-trial decision) and MTBE, 739 F.Supp2d 576 (S.D.N.Y. 2010)

---

[10] See, In re MTBE, 2007 WL 1601491 (S.D.N.Y. 2007)("MTBE VI"). (The Second Circuit utilized roman numerals to identify the numerous MTBE lower court decisions. 725 F.3d 65 (2nd Cir. 2013 at fn 1). See, MTBE VI at p. 8 (emphasis added):

> To the contrary, twelve (12) of the City's wells had no MTBE detections until after October 31, 2000: eleven (11) of these wells had no detections until after December 10, 2001. Injuries arising from the last eleven (11) of these MTBE detections are therefore timely as to all defendants.

See, also, Id at p.14, Table 3, Lg.

[11] The same result was reached in Suffolk County Water Auth. v. Dow Chemical, 121 A.D.3d 50 (2nd Dept. 2014)("SCWA"). Of the 159 wells at issue in that case, 8 had no detections of plume contaminants prior to the statutory cutoff date - just like the 12 in MTBE VI. Indeed, Dow never even challenged the statute of limitations for these 8 wells.

[12]See, S.D.N.Y Docket # 1:04cv03417, Document 345 and S.D.N.Y. Docket # 1:04cv03417, Docket 409.

[13] Judge Scheindlin essentially incorporated all of the arguments made by the City of New York in crafting her decision in MTBE IX. (See, S.D.N.Y. Docket #1:04cv03417, Document 388).

("MTBE XII") (post-trial decision).  Adopting the rationale employed by Judge Scheindlin in both of those cases, this Court also rejected an "anticipatory" upgradient accrual rule for CPLR 214-c (2) in 725 F.3rd 65 (2nd Cir. 2013) ("MTBE 2013").  This Court must now apply its rationale in MTBE 2013 to the case at bar and reverse Judge Feuerstein.

# POINT I

## Accrual of CPLR 214-c (2) Requires Exposure to Contamination, "Specifically the Migration of TCE into the Well Head".

A.    There is no Statute of Limitations Triggering Injury until there is Contamination at the Well Head.

In Jensen v. General Elec. Co., 82 N.Y.2d 77, 81, 603 N.Y.S.2d 420 (Ct. App. 1993) ("Jensen"), the Court of Appeals held that the statute of limitations for CPLR 214-c (2) was amended by the Legislature to allow for a "discovery" standard. The statute accrues when the plaintiff knows, or reasonably should have known, of injury "upon or within his property".

In applying CPLR 214-c (2) to the case at bar, Jensen directs that this Court must define the parameters of "upon or within property" in relation to the specific "property interest" at issue. With respect to a municipal water provider in a contamination case, all New York State and Federal decisions have held that a municipal water provider's "property interest" lies solely in its right to the water in the aquifer directly under its property.[14] This usufructuary[15] right was recognized by this Court in MTBE 2013, page 109 at fn 31:

---

[14]   New Jersey applies the same usufructuary rights to the aquifer. See, Town of East New York v. Hackensack Water Co. 27 NJ 377 (NJ Sup. Ct. 1957).

[15]   Judge Scheindlin addressed the water provider's usufructuary interest to the aquifer in 643 F. Supp. 2d 446 at fn. 57 (S.D.N.Y. 2009) ("MTBE VIII") (citing Westphal v. City of New York 75 A.D. 252, 78 N.Y.S. 56 59 (2nd Dept 1902). Clearly, the "upon or under his lands", referenced in Westphal, is the statutory equivalent of "upon or within property" utilized by CPLR 214-c (2).

7

Under New York Law, the City does not actually own the
water in Station Six, it simply owns the right to use that
water. See <u>Sweet v City of Syracuse</u>, 129 NY 316 (Ct.
App. 1891). This is referred to as a "usufructuary" interest.

Conversely, the water provider does not have a "property" right to the

upgradient aquifer[16]. The water providers' property interests are circumscribed to

that restricted portion of the groundwater which its pumps can draw up into its well

head.[17] Thus, in this case, the statute of limitations is triggered only when sufficiently

injurious levels of toxins are, or should have been, discovered in the "untreated

water" under the Plant 4 well heads.[18] Consequently, the Magistrate was simply

wrong when she held that "in a well is not dispositive" to trigger accrual of CPLR

214-c(2). A. 1773. Indeed, Judge Scheindlin and this Court specifically noted that

---

[16] In New York, the upgradient aquifer comes under the jurisdiction of the DEC while in New
Jersey it is the DEP. <u>See</u>, 2011 WL 4439477.

[17] <u>MTBE 2013</u> at 110-111 (italics in original)(emphasis added):

It brought suit only after <u>testing</u> showed the presence of MTBE in
the Station Six Wells.

[18] <u>MTBE 2013</u> p. 82 (emphasis added):

The City first detected MTBE in the Station 6 Wells in April 2000
<u>When readings from untreated water drawn</u> from one well showed
MTBE concentrations of 0.73 ppb and <u>readings</u> from another well
showed MTBE concentrations of 1.5 ppb. *Id*. ¶¶ 108, 111. *Id.* ¶ 109.
<u>Testing</u> conducted three years later in January 2003 showed that the
MTBE levels had reached 350 ppb in one of the wells.

the "*location*"[19] of the plaintiff's injury is the "groundwater that will be drawn into the Station 6 wells when they begin operation.

Likewise, in discerning the "property interest" alleged to have been injured, in Suffolk County Water Authority v. Dow Chemical Company, 121 A.D.3d 50 (2ndDept. 2014)("SCWA"), the Second Department would not accrue the statute of limitations until the time the toxic plume "migrates" into the well head. Thus, in this case, there must be a "migration"[20] or "wrongful invasion"[21] of OU3 plume which directly "impacts"[22]into the Plant 4 well head before actionable injury to property accrues.

B.    The Magistrate's Compound Error Lies in Her Failure to Appreciate the District's Limited Usufructuary Rights to the Aquifer and Her Misapplication of Jensen.

The Magistrate failed to follow the "in the well head" standard and instead adopted NG's "anticipatory action" upgradient accrual rule. The source of the Magistrate's error has its genesis in both her failure to appreciate a water providers'

---

[19] MTBE XII at 584-85 ("[T]he *location* of that injury is the groundwater that will be drawn into the Station 6 wells when they begin operation."). This Court confirmed Judge Scheindlin's post-trial MTBE XII ruling citing the Jury Instructions in Phase II. MTBE 2013 at 85.

[20] SCWA at 58 "A latent injury occurs at the time of exposure . . . specifically, the migration of PCE or TCE into the *wells."*(emphasis added)

[21] In MTBE VIII at 454 Judge Scheindlin states "that under New York Law, the injury in a toxic tort case is sustained at the time the noxious substance *entered* the body, not when the harm manifests", citing at fn 53 Schmidt v. Merchants' Despatch Transp. Co. , 270 N.Y. 287 (emphasis added) ("The injury occurs when there is a wrongful invasion of personal or property rights".)

[22] MTBE VIII at 457 ("injury caused by a toxic substance occurs at the time of impact . . .")(emphasis added)

9

limited usufructuary rights and a faulty application of <u>Jensen</u>. The Magistrate acknowledged that the OU3 Plume was always upgradient[23] of Plant 4. Nevertheless, the Magistrate argues that <u>Jensen</u> is applicable here, in principle, because it allows for a "balancing of interests": A- 1775 (emphasis added):

> As recognized by the Court of Appeals in <u>Jensen</u>, Section 214-c (2) was enacted to <u>strike a balance</u> between the harsh common law rule requiring commencement of an action <u>years before a plaintiff</u> could possibly have known of a claim, and application of a vague continuing injury rule that allows for no repose, leaving defendants "potentially liable in perpetuity". <u>Jensen</u>, 82 N.Y.2d at 87.

A simple reading of this passage indicates that the Magistrate erroneously believed that the District suffered actionable property damage "<u>years earlier</u>"[24]when the upgradient aquifer itself was first exposed to toxic contamination from NG's operations in the 1930's-40s. The Magistrate notes that "The groundwater contamination forming the back-drop of [the District's] claims is traced back to Grumman's business activity beginning in and around 19[3]9 [sic]. During that time

---

[23]  Magistrate's Report and Recommendation ("R & R"), Part VII, discussing upgradient vertical profile borings. A-1755-59.

[24] The Magistrate relied upon NG who claimed that the District had "knowledge <u>years earlier</u> of the source of the contamination". Def MOL p. 10. (emphasis added). Consequently, there is little doubt that the Magistrate ever fully comprehended the District's limited usufructuary rights and neither she nor NG ever used the term.  By virtue of this lack of understanding, the Magistrate is persuaded by NG to wrongly conclude at A-1775 (emphasis added):

> BWD was <u>long on notice</u> of the injury here and it <u>cannot change history</u> to allege that it was (and apparently alleges that it remains) unaware of statute-triggering injury.

10

period, Grumman was engaged in the business of designing and manufacturing aircraft for use during World War II."A-1753. The Magistrate then applies <u>Jensen</u> to wrongly opine that the District's "injury", and thus its claim of toxic contamination, would have accrued "somewhere between 1930 and 1996". A- 1777 (emphasis and parentheticals added):

> In sum, CPLR §214-c (2) (2) applies to <u>this claim</u> [by the District] of toxic contamination of a water supply. That statute strikes a <u>generous</u> balance between the harsh application of the common law (<u>which would have set accrual of Plaintiff's claims somewhere between 1930 and 1996</u>), and allowing those claims to accrue upon discovery of injury [in 2007]. <u>See, Jensen</u>, 88 N.Y.2d at 86-87.

As the OU3 plume was not even identified by the DEC until 2005, the only way Bethpage could be "long on notice of the injury here" would be if the injury was to the upgradient aquifer and not to any injury to its usufructuary property interest to the water under the Plant 4 well heads. Simply stated, under the Magistrate's erroneous accrual theory, the District was "first exposed" when NG first introduced contaminants into the aquifer at its plant site "somewhere between 1930s and 1996". Then, applying the "discovery" accrual under CPLR 214-c (2), the Magistrate ostensibly "strikes a generous balance" in favor of the District when it "discovers" the previous "injury" to the upgradient water supply aquifer. Once the District obtained "knowledge" of this upgradient injury "the statute began to run

11

as early as 2007"[25], and "if, however, the statute did not begin to run then, there is

no question but that the events of 2008-2009 gave the District the requisite

knowledge of injury[26] and therefore triggered accrual, at the very latest, by

November 2009". A-1771. Because migration of OU3 plume into the Plant 4 well

head – the only place in which the District has a property interest in the aquifer - has

not yet occurred in this case, the statute of limitations under CPLR 214-c (2) has not

accrued and the Magistrate committed reversible error.

C.   The Magistrate Committed Reversible Error When She Determined That
the Contamination Was In The Plant 4 Well's "Capture Zone"

The Magistrate's discussion of the capture zone crystalizes her failure to

distinguish the differing property rights to the aquifer.  Judge Scheindlin and this

Court define "capture zone" as the water at the bottom of the well which is

"captured" when the switch to the pumps are turned on and raw water is "drawn into

the well head when it begins operation".  MTBE 2013 at 85.  Instead of using this

narrow and precise delineation of "capture zone", which clearly defines the City's

---

[25] The origin of this upgradient accrual rule can be traced directly to (1) NG's Statement of Undisputed Facts at A-547: "BWD discovered its purported injury by 2007" and (2) to NG's Def. MOL in support of motion for partial Summary Judgment p. 5, "B. BWD Discovered its Purported Injury in 2007".

[26] NG advocated for a practically verbatim upgradient initial injury to the District's property. Instead of looking to the OU2 plume, however, NG referred to the original upgradient pollution of the OU3 plume in the 40s-50s.  Then, just like the Magistrate, NG claims that the discovery prong 214-c (2) was triggered when the District obtained "knowledge" of the plume in 2007.  See, A-551-559 and Def. MOL p.2.

usufructuary rights, the Magistrate misuses H2M's use of the term "zone of capture". The "zone of capture" is a totally different hydrogeological concept from "capture zone". Instead of "in the well head," H2M defines "zone of capture" as the influence of the pump in lowering the surrounding water table several hundred feet away. A-864. Indeed the Magistrate recognizes that H2M defines "zone of capture as water table draw down at some distance away from the well". A-1757-58.

H2M's "zone of capture" is a shorthand layman's explanation for the hydrogeological concept identifying the "conical sphere of influence" on the aquifer inaugurated at the bottom of the well head when the pumps are turned on. The "cone of influence" then spreads upward to the surface of the groundwater pulling it down to the well head. This "sphere of influence" on any particular toxic plume is impacted by many factors including (a) the pumping capacity of the district's well itself; (b) the "competing" spheres of influence generated by myriad other water provider wells in the vicinity; (c) the very structure of the glacial deposits forming Long Island itself and the "natural" flow of the plume, either north or south depending on the location of the moraine; and (d) the complex underground geological strata downgradient from the plume, such as impenetrable clay layers, which might prevent any upgradient plume from ever impacting a deep water well.

All of these factors, and more, create intricate questions of fact which only expert hydrogeologists can offer to a jury through "water flow models". Indeed all

of the discussion on "spheres of influence" pertain solely to what Judge Scheindlin defines as a "pure future injury claim".[27]   Consequently, when the Magistrate equated "capture zone" with "sphere of influence" she committed reversible error twice.  First, upgradient contamination of the aquifer is injury to the state not the water provider.  Second, the "sphere of influence" of a well may never draw a toxic plume into the wellhead and CPLR 214-c (2) would never be triggered at all.

---

[27] <u>MTBE IX</u> at 4.

## POINT II

### The Accrual Rules Established in the MTBE Multi District Litigations Control the Outcome of this Case.

A.  Judge Scheindlin Rejects the Argument that "knowledge" of an Upgradient Plume Triggers Accrual of CPLR214-c (2)

The Magistrate supports her "anticipatory" upgradient accrual rule by wrongly pointing to the District's "knowledge" of the upgradient plume[28]. Judge Scheindlin clearly rejected the argument that simple "knowledge" of the oncoming plume constitutes "injury to property".[29] "One cannot <u>know</u> of an injury that does not exist". <u>MTBE IX</u> at 3.

B.  Judge Scheindlin Also Rejects the Argument that "Anticipatory Action" to Ameliorate the Effects of a Contamination Accrue CPLR 214-c (2)

Finally, the Magistrate argues that CPLR 214-c(2) accrues when the District "took action" in response to its "knowledge" of the upgradient OU3 plume.[30] Specifically, the Magistrate cites the engineer's designing of upgrades in 2008-9 and the District's initial request in 2009 for municipal bond financing from the Town.

---

[28]  The Magistrate makes repeated reference to the District's "knowledge" of the upgradient plume. A-1756, A-1760, A-1770, A-1771, A-1772.

[29]  <u>MTBE IX</u> at 1 (emphasis added):

> Exxon argues that this <u>knowledge</u> in 1999 started the limitations clock, <u>even though MTBE had not yet been detected in any of the wells</u>.

[30]  The Magistrate also makes repeated reference to the District's "taking action" prior to any OU3 detections in the Plant 4 wellhead. A-1758, A-1762, A-1770, A-1774.

In <u>MTBE IX</u>, just like NG today, Exxon premised its request for accrual of CPLR 214-c (2) when the City undertook "design and construction costs" even though these anticipatory preventive activities took place before any MTBE contamination was detected in the well head. Judge Scheindlin rejected this argument because the "preventive actions" of the City merely constituted economic loss.[31] She held that the preventive steps, including "design and construction costs are *damages*" incurred by the City "in anticipating and preparing to ameliorate the injury". <u>MTBE IX</u> at 3.

When Exxon raised its "anticipatory preventive action" accrual argument in its post-trial motion, Judge Scheindlin was equally adamant that the injury to property required to accrue 214-c (2) is contamination at the well head. Contrary to Exxon, and consistent with her ruling in <u>MTBE IX</u>, Judge Scheindlin ruled that "design and construction costs are damages" the water provider incurs to install treatment systems. <u>MTBE XII</u> at 602. This Court agreed with Judge Scheindlin and reiterated that the economic costs associated with designing and constructing the upgrades to the Station Six Wells merely addressed the "scope of *damages* flowing

---

[31]<u>MTBE IX</u> at 3 (italics in the original, emphasis added):

> Such <u>preventive action</u> plainly <u>does not start the limitations clock</u>. Rather, under New York law, the clock cannot start to run until the *injury* occurs, regardless of when one begins to take <u>preventive steps</u> to thwart or mollify an <u>anticipated injury</u>.

from the injury".[32]

Indeed, NG concedes that preventive actions, such as those undertaken by the District, do not trigger the statute of limitations. As NG rightly noted in Def. MOL, p. 45-46 (emphasis added):

> The court determined that the limitations period <u>did not commence</u> upon the incurrence of <u>design costs</u>…

In this case, the Board's retention of engineers to design a treatment facility and the initiation of municipal bonding to finance upgrades which the District anticipated it would need in the event that OU3 actually hit Plant 4 undeniably took place prior to the OU3 plume reaching the Plant 4 well heads. As NG correctly notes, under <u>MTBE</u>, these preventive actions cannot trigger the statute of limitations under CPLR 214-c(2).

It should be noted, that while NG concedes that the retention of engineers does not trigger the statute of limitations, NG then departs from the holding in <u>MTBE IX</u> to argue that construction undertaken to prevent future potential damage does

---

[32]<u>MTBE 2013</u> at 110 (italics in the original)(emphasis added):

> Exxon's extensive discussion of the current disuse of the Station Six Wells, <u>and the future steps required to use them, addresses the scope of the *damages* flowing from the injury, not whether there is an injury at all.</u>

17

somehow triggers the statute of limitations.[33]   However, NG's futile attempt to redefine of the preventive steps taken by the District must be flatly rejected.  Neither Judge Scheindlin nor this Court ever made any distinction between engineering costs or construction costs.  Both "actions" stood on equal footing as "economic damages" and neither constituted statutory triggering "injury to property." <u>MTBE IX</u> at 3 (italics in the original)(emphasis added):

> The design and **construction** costs of the Station 6 treatment plant is *not* the City's injury. The injury is the *contamination* of the City's groundwater… The MTBE contamination is the *injury;* the design and construction costs are *damages* the City seeks to recover for remediating the injury. <u>The clock starts, at the earliest, when the injury occurred, not when the City first incurred costs in anticipating and preparing to ameliorate the injury.</u>

When Exxon again argued in its post-trial motion that design and construction[34] "actions" undertaken to "treat" contaminants in the future triggered

---

[33] Def. MOL at 46 (emphasis added):

> BWD's actions before November 2010, however, were not limited to "early design plans" for treatment systems for future use, but rather included removing wells from service and the emergency <u>construction of such treatment systems</u>.  These actions triggered the statute of limitations like the actions cited in *MTBE 2007* and were not merely "anticipatory" actions that the court considered in *MTBE 2009.*

[34] In any event, NG raises this "construction trigger" argument <u>for the first time on appeal</u> conceding Judge Scheindlin's controlling decision in <u>MTBE IX</u>.  Instead, NG repeatedly argued below, and the Magistrate clearly held, that "the facts alleged in BWD's pleadings and other

the statute, Judge Scheindlin was crystal clear. The only time CPLR 214-c(2) would be triggered is when tests of raw water at the well head detect significant levels of toxic contamination. In re MTBE, 739 F. Supp.2d 756, 602 (S.D.N.Y. 2010) ("MTBE XII")(italics in original)(emphasis added):

> The *injury* is the contamination of the City's groundwater… [T]he design and **construction** costs are damages the City seeks to recover in remediating the *injury*".

---

statements date the accrual of its putative claims as early as 2007 but <u>no later than 2009</u>." Def. MOL, P. 20 (emphasis added). Indeed, this new "construction activity accrual", all of which took place after 2010, constitutes a complete 180 degree about face. NG forcibly argued, and the Magistrate explicitly agreed, that "C. There Was No New Material Information or Change in Circumstances after 2009." Id. at 15. NG clearly acknowledges that bond financing was not finalized until January 2010. Def. Statement of Undisputed Facts, ¶75, A-558. Likewise, "construction of the GAC and second AST began in 2010 and was completed in January 2012 when both Plant 4 wells were returned to operation." Id. at ¶79, A-559. Consequently, even under NG's newly formulated "construction action" trigger, the Magistrate's Report cannot stand. NG's position that "preliminary engineering costs" do not trigger CPLR 214-c(2) under <u>MTBE IX</u> vitiates the Magistrate's rational as "engineering costs" constituted the "taking action" she relied upon to time bar the District's suit. As the Magistrate's decision stands in naked contrast to NG's concession that engineering costs do not trigger CPLR §214-c (2) under <u>MTBE IX</u>, it must be vacated by this Court.

19

## POINT III

**The "Reasonable Water Provider" Rule Only Applies (i) When
There Has Been Contamination of the Property Interest at Issue,
and (ii) Only to the Extent of Determining Whether Such
Contamination Reaches the Level of Injury**

A.      MTBE XIII is the Only Court to Ever Use the RWP Standard

The fundamental flaw in the Magistrate's Report is her "overbroad" application of the RWP standard to the TCE in the OU3 plume in this case. The MTBE litigation is the first and only time the phrase "reasonable water provider" has been utilized anywhere in the Country.[35]

B.      The MTBE Standard Is Only Applicable When There is At Least Some
Cognizable Level of Contamination in the Wellhead

The Magistrate "automatically" applied the RWP standard once BWD had "knowledge" of the upgradient OU3 plume. It then became a "reasonable water provider" when it "took action" to ameliorate potential contamination of the wellhead by designing and implementing treatment upgrades to Plant 4. There are two fatal flaws in this argument. First, unlike the Magistrate, the MTBE decisions did not apply the RWP standard to upgradient plumes but only when there was an "injurious" level of MTBE in the wellhead. Second, Judge Scheindlin ruled that the statute of limitations does not run, as a matter of law, if there are no detections of

---

[35] See, MTBE 2013 at 87, 108-9; MTBE VIII at 486-7, 496-7;  MTBE X 2009 WL 3347214 at 6; MTBE XII at 584-5, 587-8.

contamination in the wellhead from the upgradient plume.

This Court specifically agreed with Judge Scheindlin.[36] "Even clear, good-tasting water contains dozens of contaminants" at *de minimis* levels which will not accrue CPLR 214-c (2) as a matter of law. MTBE 2013 at 108 citing to MTBE VI at 6. This Court also stated that the City did not have to wait to establish "injury to its water", or wait to commence suit, until the level of MTBE exceeded the MCL. "The MCL does not convey a license to pollute up to that threshold". MTBE 2013 at 109. The question before this Court and Judge Scheindlin was the City's contention "that it was injured when the concentration of MTBE at Station Six rose to a level [over *de minimis* and under the MCL] at which a reasonable water provider would have treated water". MTBE 2013 at 111 (parenthetical and emphasis added).

C.   The RWP Standard Is a Factual Test of Sufficiency Only Applicable in Cases Where There is a "Grey Area" of Contamination Levels

Judge Scheindlin first addressed the City's "question" by examining the characteristics of MTBE. Indeed, it is highly likely that the RWP standard applies solely to the unique "taste and smell" characteristics of MTBE. Even though the MCL is 10 μg/l, MTBE can still negatively impact many consumers at lower levels. MTBE can be detected by "taste and smell" by 25 % of the consuming public

---

[36] MTBE 2013 at p. 108, fn. 29.

starting at 3 µg/l to 4 µg/l.[37]   Consequently, even at these low levels the public "confidence" in the water supply would be severely compromised.

Confronting these unique characteristics, Judge Scheindlin divided the MTBE claims into three categories.[38] Where the water provider knew before the statutory cutoff date that an individual well had been impacted with MTBE over the MCL of 10 µg/l, the statute of limitations for that well was time-barred. Likewise, if the MTBE plume was still upgradient, and there were no detections of an MTBE plume at the well prior to the statutory cutoff date, there could be no statute of limitations defense as a matter of law.  Judge Scheindlin's third category covered a level of MTBE above *de minimis*[39] and below the MCL.  It was in this "grey" area where the question arose as to whether the City "knew" that a significant proportion

---

[37]<u>MTBE 2013</u> at 106 (emphasis added):

> It also offered testimony from a taste and odor expert who opined that "<u>twenty-five percent of the population would detect [MTBE] at 3 to 4 parts per billion</u>" . . . thereby undermining public confidence in the City's water supply.

[38]<u>MTBE IX</u> at 2. "Applying these rules, I divided the City's c<u>laims into three categories.</u>" (emphasis added):

[39] "The fact is even clean, clear, good-tasting water contains dozen of contaminants at low levels." <u>MTBE VI</u> at 6.  When Exxon raised this argument again on appeal, this Court held that "In a case such as this involving a <u>core municipal function</u>" and "<u>implicating an unusually compelling public interest</u>", raw water concentrations below 2 µg/l would not constitute injury as a matter of law. <u>MTBE 2013</u> at 112.  (emphasis added.)

of its consumers were impacted at low levels of MTBE between 3 and 4 µg/l.[40]

In applying Judge Scheindlin's grey third category for MTBE, the water provider must demonstrate to the jury that the level of MTBE rose above *de minimis*, yet still has a negative impact on "25%" of its consumers, even though the levels are below the applicable MCL of 10 µg/l. This Court acknowledged Judge Scheindlin's holding that a jury must determine whether a water provider "would treat the water to reduce or minimize the effects of MTBE" before this back-up source of drinking water is pumped to its consumers. MTBE 2013 at 107. This jury question encompassing Judge Scheindlin's third grey category is the foundation of the RWP standard- a standard which has never been applied to any other contaminant.

Clearly, the RWP standard is not applicable here as there are no detections of OU3 in the Plant 4 wellhead. Further, in the case at bar, there can be no grey area to which the RWP standard could ever apply. There is no broad range in the MCL for TCE which stands at 5 µgl. There is no taste and smell at 3 µgl of TCE. Indeed, with the massive levels of TCE in the OU3 plume, Plant 4 will be overwhelmed the day the plume hits.

---

[40] MTBE X 2009 WL 3347214 at 6. ("[I] have held that MTBE concentrations that do not exceed the MCL may injure the City because a reasonable water provider may deem it best to clean up even low concentrations of MTBE…").

# POINT IV

## Judge Feuerstein's Decision Has Devastating Impact on All Long Island Water Providers

A.    All Water Providers Have a Statutory and "Common Sense Obligation" to Protect their Wells in Advance of an Impending Upgradient Toxic Plume

All water providers throughout New York State must comply with "Part V" of the New York State Sanitary Code.[41] Its detailed rules provide critical guidance to our Superintendents. These skilled professionals work tirelessly to assure a safe and adequate supply of water for their constituents and their licenses are on the line regarding compliance with the Sanitary Code. As this Court well knows, Part V demands that all water providers take proactive preventive action to prepare for the potential impact of an impending toxic plume. MTBE 2013 at 106:

> This is especially so in view of a New York water provider's statutory duty and commonsense obligation **\*106 to protect** or remediate groundwater *before* contamination reaches the applicable MCL.

Judge Scheindlin and this Court fully affirmed the City's position that the "reasonable water provider" standard does not accrue the statute of limitations for CPLR 214-c (2) "absent actual contamination" in the well head. Clearly the Magistrate failed to appreciate, as this Court certainly did – and NG now also

---

[41] 10 NYCRR 5-1.12, Water quality for existing sources of water supply.

belatedly admits - that the water providers' "knowledge" of an upgradient plume, together with its common sense and statutory duty to prepare for potential impact through preliminary engineering, does not constitute a statutory triggering injury. In short, "The treatment and the injury are not the same." [42] By virtue of this failure, the Magistrate wrongly concluded that the District's duty to comply with Part V of the State Sanitary Code simultaneously triggered accrual of the statute of limitations under CPLR 214-c (2). A-1777-78.

B. Under Judge Feuerstein's Decision, All of Long Island's Water Providers Are Either Time-Barred or Face an Impossible Public Policy Dilemma

The *amicus* herein, and all the water providers on Long Island, raise their voice in unison and cry out for reversal of Judge Feuerstein's decision. All have been advised that the statute of limitations under CPLE §214-c(2) did not accrue until their well head had been "hit" by a toxic plume. Some actually relied upon the 2009 decision of Judge Feuerstein and this Court's 2013 affirmance in MTBE that proactive, preliminary planning for treatment systems did not accrue CPLR §214-c(2). Consequently, for nearly a decade all water providers have dedicated themselves to what this Court has found to be their "common sense and statutory

---

[42] Plaintiff City of New York's Memorandum of Law (S.D.N.Y. Docket 1:04cv03417, Document 388) at 4-5, 11 and 15.

obligations". Each must be proactive in compliance with the State's Sanitary Code and protect their well heads *before* the toxic plume makes impact.

In accordance with these mandates, water providers can have treatment plans pre-approved by the health department. They can also have pre-funding in place by securing bond financing from the Town. This is precisely the proactive path followed by BWD. And it is precisely the path already followed by many other water providers on Long Island. All of this effort invested by these water providers will be decimated, however, if Judge Feuerstein is not reversed. They will be time-barred from seeking redress against the polluter before they have ever suffered injury at the well head.

This Court has held that the proactive engineering undertaken in the face of upgradient plumes involves a "core municipal function." <u>MTBE</u> at 12. Accordingly, there should be no restraint or any hesitation on the part of the water providers to safeguard their well sites as these efforts "implicate an unusually compelling public interest." <u>Id</u>. Unfortunately, Judge Feuerstein's Decision eviscerates this fundamental public policy. While no water provider would ever shirk from its "common sense and statutory obligations," Judge Feuerstein's Decision must make them think twice before engaging their engineers to do advanced planning as that action would trigger accrual of CPLR 214-c(2). For the balance of those water providers who have not commenced preliminary engineering, Judge Feuerstein's

26

decision sends shivers down their spines. They must seriously consider postponing the work of their engineers until they are ready to institute a lawsuit against the Potentially Responsible Parties. Consequently, if Judge Feuerstein's decision is not reversed, it will serve as a deterrent to water providers to investigate potential plumes and possible prevention of harm for fear of triggering the statute of limitations before a harm has actually occurred.

Based upon the foregoing, it is respectfully requested that this motion to file an *Amicus* brief be granted and that this Honorable Court reverse Judge Feuerstein's Decision.

Dated:   Farmingdale, New York
         September 12, 2017

Respectfully submitted,

MICHAEL F. INGHAM, ESQ.

*Counsel for Amicus Curiae*
Long Island Water Conference
Nassau Suffolk Water Commissioners Association
Nassau County Village Officials Association

Certificate of Compliance with Type-Volume Limit,
Typeface Requirements and Type-Style Requirements

This document complies with the type-volume limit of Fed. R. App. P. 32(3) and Local Rule 32.1(a)(4)(A) of the Court of Appeals for the Second Circuit because, excluding parts of the document exempt by Fed. R. App. P. 32(f) this document contains 6,481 words.

This document complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type-style requirements of Fed. R. App. P. 32(a)(6) because this document has been prepared in a proportionally spaced typeface using Microsoft Word 2013 in Times New Roman, size 14 pt.

Dates:   Farmingdale, New York
         September 12, 2017

        Michael F. Ingham, Esq
        CARMAN, CALLAHAN & INGHAM, LLP
        266 Main Street
        Farmingdale, New York 11735
        (516) 249-3450
        (516) 843-6390 (fax)
        Attorneys for *Amicus Curiae*

        Long Island Water Conference
        Nassau Suffolk Water Commissioners Association
        Nassau County Village Officials Association